# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK
### WHITE PLAINS

| | |
|---|---|
| Jamie Martelli, individually and on behalf of all others similarly situated, | 7:21-cv-10079 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| Rite Aid Corporation, | |
| Defendant | Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1.    Rite Aid Corporation ("Defendant") manufactures, labels, markets, and sells infant formula with iron to children between 9 and 18 months under the Tugaboos brand, identified as "Toddler Beginnings" ("Product").



2.      According to the World Health Organization ("WHO") and private and public health groups, breast milk is the "gold standard" for infant nutrition.

3.      The American Academy of Pediatrics (AAP) recommends "exclusive breastfeeding for the first 6 months of life with the addition of complementary foods and the continuation of breastfeeding until at least 12 months of age."[1]

4.      Infant formula with added iron is the accepted alternative where breastfeeding is not an option. 21 C.F.R. § 106.3 (defining infant formula as "a food which purports to be or is represented for special dietary use for infants [0-12 months] by reason of its simulation of human milk or its suitability as a complete or partial substitute for human milk.").

5.      The transition beyond the first twelve months is "critical for establishing healthy dietary preferences and preventing obesity in children."[2]

6.      The formula trade group, the Infant Nutrition Council of America ("INCA"), recommends that "transition formulas," such as Toddler Beginnings, be used to fill "nutrition gaps," beyond 12 months.[3]

7.      However, a global consensus of pediatric health organizations, including the AAP Committee on Nutrition and the relevant Sub-Committees of the WHO disagree with INCA's conclusion, and advise that beyond 12 months, nutritional needs should be met with whole cow's milk, water and healthy whole foods as part of a balanced diet.[4]

---

[1] *Id.*
[2] Jennifer L. Harris, and Jennifer L. Pomeranz, "Infant formula and toddler milk marketing: opportunities to address harmful practices and improve young children's diets." Nutrition Reviews (2020).
[3] Olga Khazan, The Ominous Rise of Toddler Milk, Baby-formula sales are slumping, so the companies that make it have turned to supplements for 3-year-olds, December 29, 2020.
[4] AAP Committee on Nutrition, 1988. Follow-on formulas follow-up or weaning formulas. Pediatrics 83, 1067 1989; World Health Organization, July 17, 2013. Information concerning the use and marketing of follow-up formula.

## I.   DEFENDANT'S TODDLER BEGINNINGS IS VIRTUALLY IDENTICAL TO ITS INFANT FORMULA EVEN THOUGH IT IS NOT RECOMMENDED

8.   Since 2003, rates of breastfeeding have increased significantly, resulting in a decrease in sales of infant formula.

9.   To make up for declining sales of infant formulas, companies have introduced products marketed as "transition formulas," "follow-on formulas," "weaning formulas," "toddler milks," and "growing-up milks" ("GUMs") (collectively, "Transition Formulas") to children between 12 and 36 months old.[5]

10.   U.S. Nielsen data shows advertising spending on transition formula quadrupled between 2003 and 2015, with sales increasing almost threefold.

11.   Companies like defendant capitalize on consumers' familiarity and acceptance of federally-approved infant formula and continue selling them the same or substantially identical products even when their children are no longer infants, defined as zero to 12 months old.

12.   Defendant's Toddler Beginnings (right) is advertised and marketed in a way that is similar to its Infant Formula, through common labeling formats, images, design, type size, fonts, claims, call-outs and graphics.

---

[5] Jennifer L. Pomeranz, Maria J. Romo Palafox, and Jennifer L. Harris. "Toddler drinks, formulas, and milks: Labeling practices and policy implications." Preventive medicine 109 (2018): 11-16 (citing American Academy of Pediatrics (AAP) Committee on Nutrition and World Health Organization (WHO) findings).

 

13.     The identical labeling elements ride the coattails of the carefully regulated and trusted Infant Formula to drive sales.

14.     Federal and identical state regulations require companies to identify and describe a product in a way that distinguishes it from other products, so consumers can make informed purchasing decisions.

15.     The Product's name, "Infant Formula With Iron – Milk-Based Powder" (right) is deceptive and misleading because it is confusingly similar and identical to the name of Defendant's infant formula, "Infant Formula – Milk-Based Powder With Iron" (left).



16.     The transition formula's name, "Infant Formula With Iron – Milk-Based Powder," does not distinguish the Product from the Infant Formula Product and fails to tell caregivers how

it differs from the Infant Formula.

17.    This gives caregivers the incorrect impression that the Toddler Beginnings is nutritionally adequate for children over a year, even though their needs are different from infants.

18.    The two products contain other similar representations which further the incorrect impression that the Toddler Beginnings is appropriate for children after infancy.

## II.    THE TODDLER BEGINNINGS PRODUCT IS NUTRITIONALLY INCONSISTENT WITH EXPERT ADVICE

19.    Child nutrition experts universally oppose consumption of added sugars by children between twelve and twenty-four months.

20.    Contrary to the recommended nutritional needs of children in this age range, the Product contains added sugar.

21.    Compared to cow's milk, recommended by global health authorities, the Toddler Beginnings Product contains less protein, more sugar (carbohydrates) and more fat.[6]

22.    According to the price of the Product on third-party websites, the Product costs no less than $17.99 for 20 oz (576 g).

23.    According to the Retail Milk Prices Report of the United States Department of Agriculture, whole milk in New York City costs almost $4 per gallon.

24.    This means the Toddler Beginnings Product is several times the cost of the recommended alternative and nutritionally superior choice of whole cow's milk.

25.    The similar labeling of the Infant Formula and Toddler Beginnings causes caregivers, like Plaintiff, to make inaccurate and ill-advised nutritional purchasing decisions.

26.    For instance, a study of caregivers' understanding of transition formula labeling

---

[6] Consensus Statement, Healthy Beverage Consumption in Early Childhood: Recommendations from Key National Health and Nutrition Organizations, Robert Wood Johnson Foundation, Healthy Eating Research, Sept. 2019, Appendix D.

concluded that 52% expected these products to "give toddlers nutrition that they wouldn't get from other sources."[7]

27.    Seventy percent of caregivers mistakenly believe that products like Toddler Beginnings are suitable drinks for children in this age range, despite expert opinions that they offer "no unique nutritional value beyond what could be achieved through a nutritionally adequate diet; furthermore, they contribute added sugars to diet."[8]

28.    Public health research has shown that use of products such as Toddler Beginnings results in prolonged use of expensive, re-branded, infant formula instead of transitioning infants to cow's milk, water and other healthy foods, which provide nutrients that milk cannot provide

29.    The representation that the Product is "NON-GMO" and made with ingredients that have not been genetically engineered is misleading because it is made from dairy ingredients from cows which have consumed genetically modified feed.

30.    The Product contains other representations which are misleading.

31.    Reasonable consumers must and do rely on a company to honestly identify and describe the components, attributes, and features of a product, relative to itself and other comparable products or alternatives.

32.    By labeling the Product in this manner, Defendant gained an advantage against other companies, and against consumers seeking to purchase a product that was nutritionally appropriate for children in the age range identified by the Product.

33.    The value of the Product that plaintiff purchased was materially less than its value as represented by defendant.

---

[7] Maria J Romo-Palafox and JL Pomeranz et al., Marketing claims on infant formula and toddler milk packages: What do caregivers think they mean? , UCONN Rudd Center for Food Policy & Obesity, September 2019.
[8] *Id.*

34.    Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

35.    Had Plaintiff and proposed class members known the truth, they would not have bought the Product or would have paid less for it.

36.    The Product is sold for a price premium compared to other similar products, no less than approximately $17.99 for 20 oz (576 g), a higher price than it would otherwise be sold for, absent the misleading representations and omissions.

<u>Jurisdiction and Venue</u>

37.    Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

38.    The aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

39.    Plaintiff Jamie Martelli is a citizen of New York.

40.    Defendant Rite Aid Corporation, is a Delaware corporation with a principal place of business in Camp Hill, Cumberland County, Pennsylvania.

41.    The parties are citizens of different states.

42.    Defendant transacts business within this District through sale of the Product within this District, through its hundreds of stores within this State, and dozens within this District, and online, sold directly to residents of this District.

43.    Venue is in this District because plaintiff resides in this district and the actions giving rise to the claims occurred within this district.

44.    Venue is in the White Plains Courthouse in this District because a substantial part of the events or omissions giving rise to the claim occurred in Dutchess County, i.e., Plaintiff's

purchase of the Product and her awareness of the issues described here.

<u>Parties</u>

45.    Plaintiff Jamie Martelli is a citizen of Poughkeepsie, Dutchess County, New York.

46.    Defendant Rite Aid Corporation, is a Delaware corporation with a principal place of business in Camp Hill, Pennsylvania, Cumberland County.

47.    Defendant is one of the largest and most trusted drug stores in the country, selling not only medical, prescription, and OTC items, but food, household goods, and other sundries.

48.    Since people trust Defendant to dispense medication, they carry that trust over to other products which satisfy other essential needs, like nutrition for small children.

49.    While Rite Aid stores sell leading national brands, they sell a large number of products made especially for young children, under one of their private label brands, Tugaboos.

50.    Private label products are made by third-party manufacturers and sold under the name of the retailer, or its sub-brands.

51.    Previously referred to as "generic" or "store brand," private label products have increased in quality, and often are superior to their national brand counterparts.

52.    Products under the Tugaboos brand have an industry-wide reputation for quality and value.

53.    In releasing products under the Tugaboos brand, Defendant's foremost criteria was to have high-quality products that were equal to or better than the national brands.

54.    Defendant is able to get national brands to produce its private label items due its loyal customer base and tough negotiating.

55.    That Tugaboos branded products met this high bar was proven by focus groups, which rated them above the name brand equivalent.

56.   Private label products generate higher profits for retailers because national brands spend significantly more on marketing, contributing to their higher prices.

57.   A survey by The Nielsen Co. "found nearly three out of four American consumers believe store brands are good alternatives to national brands, and more than 60 percent consider them to be just as good."

58.   Private label products under the Tugaboos brand benefit by their association with consumers' appreciation for the Rite Aid brand as a whole.

59.   The development of private label items is a growth area for Rite Aid, as they select only top suppliers to develop and produce Tugaboos products.

60.   Plaintiff purchased the Product on one or more occasions within the statutes of limitations for each cause of action alleged, from Defendant's stores, including the location at 709 Main Street Poughkeepsie, NY 12601, in 2019 and/or 2020, among other times.

61.   Plaintiff bought the Product because she expected it was nutritionally appropriate for children in the age range identified by the Product because that is what the representations said and implied.

62.   Plaintiff relied on the words and images on the Product, on the labeling and/or claims made by Defendant in digital and/or social media.

63.   Plaintiff bought the Product at or exceeding the above-referenced price.

64.   Plaintiff would not have purchased the Product if she knew the representations and omissions were false and misleading or would have paid less for it.

65.   Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes and/or lower-priced non-similar products which did not make the statements and claims made by Defendant.

66.    The Product was worth less than what Plaintiff paid and she would not have paid as much absent Defendant's false and misleading statements and omissions.

67.    Plaintiff intends to, seeks to, and will purchase the Product again when she can do so with the assurance that Product's representations are consistent with its abilities and/or composition.

68.    Plaintiff is unable to rely on the labeling of not only this Product, but other similar products, because she is unsure of whether their representations are truthful.

<u>Class Allegations</u>

69.    Plaintiff seeks certification under Fed. R. Civ. P. 23(b)(2) and (b)(3) of the following classes:

> **New York Class:** All persons in the State of New York who purchased the Product during the statutes of limitations for each cause of action alleged.

> **Consumer Fraud Multi-State Class**: All persons in the States of North Dakota, Virginia, Kansas, and Wyoming, who purchased the Product during the statutes of limitations for each cause of action alleged

70.    Common questions of law or fact predominate and include whether defendant's representations were and are misleading and if plaintiff and class members are entitled to damages.

71.    Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

72.    Plaintiff is an adequate representative because her interests do not conflict with other members.

73.    No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

74.    Individual actions would risk inconsistent results, be repetitive and are impractical

to justify, as the claims are modest relative to the scope of the harm.

75.    Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

76.    Plaintiff seeks class-wide injunctive relief because the practices continue.

<u>New York General Business Law ("GBL") §§ 349 & 350</u>

<u>(Consumer Protection Statute)</u>

77.    Plaintiff incorporates by reference all preceding paragraphs.

78.    Plaintiff and class members desired to purchase a product that was nutritionally appropriate for children in the age range identified by the Product.

79.    Defendant's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

80.    Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

81.    Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

82.    Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

83.    Plaintiff relied on the representations that the Product was nutritionally appropriate for children in the age range identified by the Product

84.    Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Violation of State Consumer Fraud Acts

(On Behalf of the Consumer Fraud Multi-State Class)

85.     The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

86.     Defendant intended that plaintiff and each of the other members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

87.     As a result of defendant's use or employment of artifice, unfair or deceptive acts or business practices, plaintiff, and each of the other members of the Consumer Fraud Multi-State Class, have sustained damages in an amount to be proven at trial.

88.     In addition, defendant's conduct showed motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

Breaches of Express Warranty,
Implied Warranty of Merchantability and
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.

89.     The Product was manufactured, identified, and sold by defendant and expressly and impliedly warranted to plaintiff and class members that it was nutritionally appropriate for children in the age range identified by the Product.

90.     Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

91.     This duty is based on Defendant's outsized role in the market for this type of Product, a trusted drug store, responsible for meeting their medical and prescription needs.

92.     Since people trust Defendant to dispense medication, they carry that trust over to other products which satisfy other essential needs, like nutrition for small children.

93.   Thus, the Product has a higher level of trust with consumers than other brands.

94.   Plaintiff provided or will provide notice to defendant, its agents, representatives, retailers, and their employees.

95.   Defendant received notice and should have been aware of these issues due to complaints by regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

96.   The Product did not conform to its affirmations of fact and promises due to defendant's actions and were not merchantable because it was not fit to pass in the trade as advertised.

97.   Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Negligent Misrepresentation

98.   Defendant had a duty to truthfully represent the Product, which it breached.

99.   This duty is based on defendant's position, holding itself out as having special knowledge and experience in this area, a trusted drug store, responsible for meeting customers' medical and prescription needs.

100.   Since people trust Defendant to dispense medication, they carry that trust over to other products which satisfy other essential needs, like nutrition for small children.

101.   The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in defendant, one of the nation's biggest drug stores.

102.   Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Product.

103.   Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Fraud</u>

104.   Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it was nutritionally appropriate for children in the age range identified by the Product.

105.   Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provide it with actual and/or constructive knowledge of the falsity of the representations.

106.   Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations.

<u>Unjust Enrichment</u>

107.   Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

   **WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   November 25, 2021

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
60 Cuttermill Rd Ste 409
Great Neck NY 11021
Tel: (516) 268-7080
spencer@spencersheehan.com